UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

URBAN ENGINEERS OF NEW YORK, D.P.C,

Plaintiff,

-v.-

URBAN ENGINEERS, INC.,

Defendant.

24 Civ. 6249 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Urban Engineers of New York, D.P.C. ("Urban NY") and Defendant Urban Engineers, Inc. ("Urban PA") are engineering firms that historically operated in close connection.  This dispute stems from the parties' attempt, beginning in 2024, to sever their relationship.  Urban NY seeks damages for alleged tortious actions and contractual breaches, as well as a declaration stating (i) that it owes no funds to Urban PA for legacy administrative services or technical labor and (ii) that Urban NY's continued use of trademarks does not infringe on any trademark or trade dress of Urban PA.

Urban PA now seeks to dismiss 10 of the 12 counts that Urban NY raises in the First Amended Complaint (the "FAC").  For the reasons set forth below, the Court grants in part and denies in part Urban PA's motion to dismiss, though it will allow certain dismissed claims to be repleaded.  Specifically, the Court holds that Urban NY properly raises claims for (i) breach of contract; (ii) declaratory judgment; and (iii) tortious interference with prospective economic advantage.  By contrast, the FAC fails to allege viable claims for

(i) breach of an implied-in-fact contract; (ii) breach of the duty of good faith and fair dealing; (iii) economic duress; (iv) unfair competition; (v) conversion; (vi) unjust enrichment; and (vii) *prima facie* tort.

**BACKGROUND**[1]

## A.    Factual Background

### 1.    Overview of the Parties and Their Relationship

Urban NY is a New York design professional corporation with a principal place of business in New York.  (FAC ¶ 10).  Urban PA is a Pennsylvania corporation with its headquarters in Pennsylvania.  (*Id.* ¶ 11).  Urban NY and Urban PA are both engineering firms, and before their 2024 breakup, they had been affiliated for at least 50 years.  (*Id.* ¶¶ 2, 17).  In fact, Urban PA previously marketed Urban NY as Urban PA's New York "office" on its website.  (*Id.* ¶ 18).

Throughout their affiliation, Urban NY's and Urban PA's operations were integrated.  (FAC ¶ 2).  They shared administrative departments and associated resources.  (*Id.*).  Their directors, officers, and principals overlapped.  (*Id.*).  Their engineers worked together on projects.  (*Id.* ¶¶ 2, 20).  During this time, Urban NY received administrative support for its operation exclusively from

---

[1]    This Opinion draws its facts from the First Amended Complaint ("FAC" (Dkt. #28)), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on certain of the exhibits attached to the FAC and incorporated therein.  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint); Fed. R. Civ. P. 10 ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

For ease of reference, the Court refers to Defendant's memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #33-1); to Plaintiff's memorandum of law in opposition to Defendant's motion as "Pl. Opp." (Dkt. #37); and to Defendant's reply memorandum of law as "Def. Reply" (Dkt. #38).

2

Urban PA.  (*Id.* ¶ 2).  The terms of this support were memorialized in an agreement that the parties executed on December 30, 2013.  (*Id.* ¶¶ 2-3, 19; *see generally* Dkt. #28-2 ("Services Agreement")).  Under the Services Agreement, Urban NY relied on Urban PA for a myriad of administrative services, including maintaining Urban NY's project files and client information.  (FAC ¶ 19).

On July 29, 2024, Urban PA, driven by a faction of its board, decided to sever the relationship with Urban NY and its principals by issuing a termination notice.  (FAC ¶ 3; *see generally* Dkt. #28-4 ("Termination Notice")).  The process of termination involved Urban PA (i) dismissing Urban NY principals as employees and (ii) terminating the Services Agreement.  (FAC ¶ 3).

### 2.    The Relevant Agreements

The split between Urban NY and Urban PA has been messy, and much of the tension has concerned the parties' respective responsibilities under certain agreements, most notably the Services Agreement and a side letter executed the same day.  (FAC ¶¶ 21, 25; *see generally* Dkt. #28-1 ("Side Letter"); Services Agreement).  The Court accordingly discusses the relevant agreements here.

### a.    The Side Letter

The Side Letter explains the reasons for the parties' cooperation:  Urban NY derived much of its business from Urban PA referrals, and Urban PA was not licensed to perform engineering services in New York.  (Side Letter 1).  Under the Side Letter, Urban NY "agree[d] to provide professional services in New York to any clients that Urban [PA] may in its discretion refer."  (*Id.* ¶ 2).

In response, Urban PA "agree[d] to take all such action as is necessary to cause [Urban NY] to be named as an insured under [Urban PA's] professional liability and other insurance." (*Id.* ¶ 4).

The Side Letter includes a choice-of-law provision designating that Pennsylvania law governed. (Side Letter ¶ 5). The Side Letter was signed by Edward M. D'Alba, President of both Urban PA and Urban NY, on behalf of both parties. (*Id.* at 2). It was also signed by Joseph P. McAtee on behalf of Urban NY. (*Id.*).

### b. The Services Agreement

Executed the same day, the Services Agreement required Urban PA to perform certain administrative services to support Urban NY. (FAC ¶¶ 31-33). Specifically, Urban PA would provide Urban NY with services related to accounting, payroll, financial reporting, tax administration, information technology, procurement, human resources, treasury and cash management, insurance, and business development. (*Id.* ¶¶ 32-33; *see* Services Agreement § 1(a)). Beyond these enumerated services, Urban PA also agreed to "provide … such other services as [Urban NY] may request from time to time." (Services Agreement § 1(b)). Urban PA would "use its reasonable commercial efforts to provide the services" at "a quality comparable to the quality of such services that [Urban PA] maintains for its own operations." (*Id.*).

The Services Agreement gave Urban PA custody of various functions critical to Urban NY's operations. For example, Urban PA paid Urban NY's employees and vendors, managed Urban NY's banking and access to the

parties' shared Line of Credit, prepared Urban NY's financial statements, and stored Urban NY's customer and project information.  (FAC ¶¶ 19, 33, 41, 45, 65).  Despite these responsibilities, Urban PA agreed in the Services Agreement that "management, control and direction of the operations and policies of [Urban NY] shall remain at all times under the exclusive control of the board of directors of [Urban NY]."  (Services Agreement § 1(c)).

In consideration for Urban PA's services, Urban NY would pay Urban PA "an amount equal to the total costs of Urban [PA] in providing such or similar services for itself … multiplied by a fraction, the numerator of which is [Urban NY]'s net revenues for the period … and the denominator of which is the aggregate net revenues of all entities for which Urban [PA] provides such … services."  (Services Agreement § 2(a)).  For example, if Urban PA's cost of performing the services listed in the Services Agreement was $500,000, and Urban NY's fraction of the net revenue was 20%, Urban NY would owe $100,000.  Urban PA would invoice Urban NY for this amount on a quarterly basis.  (*Id.* § 2(b)).  Additionally, when Urban NY so requested, Urban PA was obligated to produce written reports of all amounts it had paid or been paid under the Services Agreement.  (*Id.* § 2(c)).

To effectuate these provisions, Urban PA was required to keep books and records memorializing the services that either party provided under the Services Agreement and to make its books and records "available for inspection on reasonable prior notice by [Urban NY] and its representatives."  (Services

Agreement § 3(a)).  The Services Agreement also specifies that any books and records that Urban PA maintained were its property.  (*Id.* § 3(b)).

The Services Agreement, like the Side Letter, is governed by Pennsylvania law.  (Services Agreement § 7(e)).  It automatically renewed each year unless one party provided notice of intent to terminate at least sixty days prior to expiration.  (*Id.* § 6(a)).  The parties allowed the Services Agreement to renew each year from 2013 to 2024.  (FAC ¶ 37).  Urban NY alleges that the Services Agreement did not change the relationship between the parties, but only "put into writing what had been the practice in any event."  (*Id.* ¶ 28 (internal quotation marks omitted)).  Mr. D'Alba signed the Services Agreement on behalf of both Urban PA and Urban NY.  (Services Agreement 5).

### c.    The Labor Sharing Arrangement

In addition to these written agreements, Urban NY argues that the parties had an unwritten arrangement regarding the sharing of labor (the "Labor Sharing Arrangement").  (Pl. Opp. 3-4; FAC ¶ 20).  Urban NY alleges that this arrangement allowed each party to draw labor support from the other for their respective projects.  (FAC ¶¶ 20, 93).  Under this arrangement, either party would provide engineers for the scope of a project and, in turn, the borrowing party would directly pay the employee's salary, payroll tax expense, and retirement contribution during the project's duration.  (*Id.* ¶¶ 20, 94).

### 3.    The Parties' Relationship Sours

#### a.    Urban NY's Change in Leadership

Urban NY's current principals did not own the company at the time the Side Letter and Services Agreement were executed.  (FAC ¶ 27).  Instead, Urban NY's stock sale occurred on or about March 26, 2015.  (*Id.* ¶ 29).  The Stock Purchase Agreement indicated the absence of any perceived threat of any action or proceeding that could materially impact the equity holdings or assets of Urban NY.  (*Id.*).  After the stock sale, the prior owners of Urban NY remained involved in both Urban NY and Urban PA.  (*Id.* ¶ 30).  Specifically, they served as executives of Urban PA and sat on both companies' boards.  (*Id.*).

#### b.    The Report and the Termination Notice

In 2024, Urban PA commissioned a self-directed "forensic review" of the amounts that Urban PA had charged to Urban NY under both the Services Agreement and the Labor Sharing Arrangement between 2014 and 2023 (the "Report").  (FAC ¶¶ 50-51).  This review occurred despite Urban NY's allegation that Urban PA's audit committee, which formed in 2021, had annually reviewed the financial relationship between the parties without expressing any concern.  (*Id.* ¶¶ 37, 52).

The Report, which Urban NY received in May 2024, indicated that approximately $6.25 million in costs and interest (the "Report Balance") should have been invoiced by Urban PA to Urban NY between 2014 and 2023.  (FAC ¶ 51).  Urban NY disputes the Report's methods and findings, claiming

that they contravene the parties' agreements.  (*Id.* ¶¶ 54-56).  Urban NY also alleges that Urban PA used the Report as pretext to remove three of Urban NY's owners from the Urban PA board and to terminate their employment.  (*Id.* ¶¶ 57-60).

Following the issuance of the Report, Urban PA, on July 29, 2024, sent the Termination Notice through its counsel to Urban NY, indicating that Urban PA intended to terminate the Services Agreement as of December 31, 2024. (FAC ¶ 61).  The Termination Notice indicates that "Urban [PA] intends to cease doing business, or have any relationship going forward, with Urban [NY]." (Termination Notice 1).  Despite this, the Termination Notice also specifies that Urban PA would "work with Urban [NY] in good faith until December 31, 2024 to transition administrative and related functions that are currently shared by the two companies."  (*Id.* at 1-2).

### 4.    The Dispute[2]

#### a.    Urban PA's Alleged Post-Termination Actions

Urban NY alleges that after sending the Termination Notice but before the termination went into effect on December 31, 2024, Urban PA stopped

---

[2]    Undergirding this litigation is a question concerning Urban NY's supposed diversion of funds after receiving the Termination Notice.  (See Def. Br. 5-6 (describing this alleged "[v]iolation of the Services Agreement" by Urban NY)).  Urban PA sources its allegation that Urban NY diverted funds from three different places, but none of them enables the Court to consider the allegation at this stage.

*First*, attached to the FAC, Urban NY included an August 13, 2024 letter from Urban PA's counsel asserting that Urban NY "has ... taken unilateral steps to divert cash from clients to benefit [Urban NY] and damage [Urban PA]."  (Dkt. #28-5).  But that is just an allegation by Urban PA's counsel and thus may not be considered on a motion to dismiss.  *See, e.g., Ortiz* v. *Consol. Edison Co. of N.Y., Inc.*, 801 F. Supp. 3d 260, 310 n.12 (S.D.N.Y. 2025) ("Needless to say, the Court cannot consider [the defendant]'s factual assertions in ruling on [a] motion to dismiss.").

performing its ongoing service and transition responsibilities.  (FAC ¶¶ 63-65).

For instance, Urban PA allegedly (i) produced deficient financial reports and

failed to properly invoice Urban NY's customers; (ii) delayed payment to Urban

NY's subconsultants and employees and stopped updating Urban NY's

employee benefits information; (iii) restricted Urban NY's access to its customer

---

*Second*, Urban PA points out that Urban NY's original complaint states that Urban PA's actions were "in retribution for Urban NY's opening of a new bank account outside of Urban PA's control, and depositing Urban NY's *own* client funds into that account." (Dkt. #1 ¶ 71).  But that allegation is absent from the FAC (*see generally* FAC), and thus the Court may not consider it, *see, e.g.*, *Trent* v. *Peddycoart*, No. 22 Civ. 3351 (GRB) (ARL), 2024 WL 5339492, at *2 n.1 (E.D.N.Y. Dec. 3, 2024) (report and recommendation) ("Typically, once the amended pleading is filed, the Court may not consider allegations set forth in the prior pleading for purposes of a motion to dismiss." (citing *McCray* v. *Lee*, 963 F.3d 110, 119 (2d Cir. 2020))); *Scott* v. *Chuhak & Tecson, P.C.*, 725 F.3d 772, 782-83 (7th Cir. 2013) ("[F]acts or admissions from an earlier complaint that are not included in a later complaint cannot be considered on a motion to dismiss.").

*Third*, on August 20, 2024, the parties agreed to, and the Court entered, a stipulation indicating the following:

> On or before August 21, 2024, Plaintiff will cause the transfer of the full amount of $200,286.49 in its M&T bank account ending in -4953 to Plaintiff's M&T bank account maintained by Defendant ending -2811. Following the completion of such transfer, Plaintiff will inactivate the M&T bank account ending -4953 and commits to opening no new bank account without discussing beforehand with Defendant.

(Dkt. #13 ¶ 1).  But this stipulation does not discuss from where the money Urban NY agreed to transfer originated.  All that the Court can draw from the stipulation is that Urban NY had a certain amount of money in a M&T bank account ending in -4953.

The Court further notes that even if it could consider the allegation that Urban NY diverted funds to an account that Urban PA did not control, such an allegation would not be material to this motion for two reasons.  For one, the timing of the alleged actions is unclear, so the Court would not be able to determine whether Urban PA's alleged breaches were excused.  (*See* FAC ¶ 65 (alleging various actions by Urban PA without specific dates)).

More importantly, however, it is unclear whether Urban NY's alleged actions would constitute a breach.  (*See* Services Agreement § 1(a)(viii) (noting that Urban PA would "manag[e] bank accounts" on behalf of Urban NY, but not indicating that Urban NY could not have separate bank accounts)).  *See also JoySuds, LLC* v. *N.V. Labs, Inc.*, No. 22 Civ. 3781 (JPC) (OTW), 2023 WL 2746772, at *10 (S.D.N.Y. Mar. 31, 2023) ("[T]he Court declines at the motion to dismiss stage to determine that [counterclaimant's] termination notice constituted a material breach barring [the counterclaimant] from bringing its claims.").

9

and project files and wiped Urban NY's profile from the shared website; (iv) refused to provide Urban NY with personnel records for Urban NY's workforce; (v) restricted Urban NY's ability to draw on the shared and co-collateralized Line of Credit and caused a default under the parties' credit facility with M&T Bank; (vi) failed to procure independent insurance coverage for Urban NY; and (vii) provided no business development support to Urban NY nor turned over Urban NY's marketing materials. (*Id.* ¶ 65).

Urban NY further alleges that as 2024 continued, Urban PA made additional demands before fulfilling its responsibilities. In September 2024, Urban PA allegedly refused to continue any transition support unless Urban NY began paying Urban PA hourly fees beyond what the Services Agreement contemplated. (FAC ¶¶ 8, 66-67). Given Urban NY's need for its information to operate and the short time period to complete migration, Urban NY accepted Urban PA's demand, incurring approximately $30,000 in fees. (*Id.* ¶ 67).

Then, in October 2024, Urban PA allegedly demanded that Urban NY enter into a contract agreeing to make payments and to surrender the company upon default. (FAC ¶ 68). And when Urban NY refused to accept, Urban PA allegedly withdrew labor supporting Urban NY projects. (*Id.*). As a result of this labor withdrawal, Urban NY claims that it had (i) to hire new labor at higher rates, (ii) to forgo certain revenue-generating projects, and (iii) to miss certain deadlines. (*Id.* ¶ 69).

Finally, in December 2024, Urban PA allegedly refused to complete the migration of critical accounting information and data that Urban NY needed to

operate at the beginning of 2025 unless Urban NY entered into a contract requiring further payment.  (FAC ¶ 70).  All the while, Urban PA allegedly told Urban NY's customers that Urban NY could not support the projects going forward.  (*Id.* ¶ 121).[3]

### b.  The MOU

By December 2024, the data migration process — which Urban NY claims was critical to its continued operation — was incomplete despite the cooperation between the parties expiring at the end of the month.  (FAC ¶¶ 70-71).  To ensure its completion, Urban NY acceded to Urban PA's demands in a Memorandum of Understanding dated December 17, 2024.  (*Id.* ¶ 72; *see generally* Dkt. #28-6 ("MOU")).  The main bargain in the MOU involved Urban PA transferring the remainder of the outstanding data (MOU §§ 3-4), in exchange for Urban NY making payments (*id.* § 2; *see* FAC ¶ 72).  The MOU includes a provision indicating that the MOU "is Binding and Enforceable." (MOU § 1).  The parties were represented by counsel when negotiating the MOU.  (*See* Pl. Opp. 5-6 (acknowledging that Urban NY was represented by counsel but arguing for that fact's immateriality)).

## B.  Procedural Background

Given the pressures allegedly caused by Urban PA's actions, Urban NY filed this case, along with a request for a temporary restraining order and a preliminary injunction, on August 19, 2024 (Dkt. #1, 4-7), just a few weeks

---

[3]  Urban NY also makes various allegations related to trademark usage.  (*See* FAC ¶¶ 74-86).  Because the instant motion does not relate to those disputes, the Court declines to recount them here.

after receiving the Termination Notice.  Urban NY sought emergency relief (i) to ensure that Urban PA continued providing services under the Services Agreement, (ii) to require that Urban PA facilitate payments that Urban NY owed, (iii) to permit Urban NY to access the parties' shared Line of Credit; (iv) to allow Urban NY to access information concerning its clients, and (v) to provide Urban NY with control over certain accounts receivables.  (Dkt. #4).

The next day, the Court entered a Stipulation and Order whereby Urban NY would transfer over $200,000 into an account maintained by Urban PA, and Urban PA would resume making payments that Urban NY owed.  (Dkt. #12-13).  On September 26, 2024, the Court entered another Stipulation and Order, this one mooting Urban NY's motion for a preliminary injunction and indicating that the parties had agreed to maintain the status quo by performing their respective obligations under the Services Agreement.  (Dkt. #17-18).  Another Stipulation and Order followed on October 10, 2024, which specified an extended timeline for Urban PA to answer or otherwise respond to the complaint, given that the parties wished "to focus their energies on th[e] separation process."  (Dkt. #19-20).

On January 28, 2025, Urban PA filed a letter seeking a conference regarding an anticipated motion to dismiss.  (Dkt. #21).  Urban NY responded, noting its desire to amend its complaint.  (Dkt. #22, 25).  Urban PA then opposed Urban NY's request to amend.  (Dkt. #26).  The Court granted Urban NY leave to amend on February 26, 2025.  (Dkt. #27).

Urban NY filed the FAC, the operative pleading in this matter, on March 7, 2025.  (Dkt. #28).  The FAC raises 12 causes of action against Urban PA: (i) breach of the Services Agreement (FAC ¶¶ 87-91); (ii) breach of an implied-in-fact contract, the Labor Sharing Arrangement (*id.* ¶¶ 92-98); (iii) breach of the duty of good faith and fair dealing (*id.* ¶¶ 99-103); (iv) economic duress (*id.* ¶¶ 104-108); (v) declaratory relief holding that Urban NY owes no administrative, professional, or labor costs to Urban PA for the 2014-2024 period (*id.* ¶¶ 109-116); (vi) tortious interference with prospective economic advantage  (*id.* ¶¶ 117-123); (vii) common-law unfair competition (*id.* ¶¶ 124-128); (viii) conversion (*id.* ¶¶ 129-132); (ix) unjust enrichment (*id.* ¶¶ 133-136); (x) *prima facie* tort (*id.* ¶¶ 137-142); (xi) declaratory relief holding that Urban NY is not infringing upon Urban PA's trademarks (*id.* ¶¶ 143-153); and (xii) declaratory relief holding that Urban NY is not infringing upon Urban PA's trade dress (*id.* ¶¶ 154-159).

Two weeks after Urban NY filed the FAC, Urban PA renewed its request for a pre-motion conference regarding an anticipated motion to dismiss all non-trademark-related causes of actions.  (Dkt. #29).  Urban NY responded on March 26, 2026.  (Dkt. #31).  The Court then set a briefing schedule regarding Urban PA's motion.  (Dkt. #32).  On April 17, 2025, Urban PA filed its motion to partially dismiss the FAC and a memorandum of law in support thereof.  (Dkt. #33).  Urban NY filed its opposition on May 15, 2025.  (Dkt. #37).  Two weeks later, Urban PA filed its reply, thus concluding the briefing on the instant motion.  (Dkt. #38).

## DISCUSSION

### A.    Motions to Dismiss for Failure to State a Claim Under Rule 12(b)(6)

Under Rule 12(b)(6), a defendant may seek dismissal of a plaintiff's complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When considering a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in Plaintiff['s] favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'"  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (quoting *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).

A plaintiff can overcome a Rule 12(b)(6) motion if the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [Plaintiff's] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)).  Moreover, "[w]here a complaint pleads facts that

14

are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

## B.    Analysis of Urban NY's Causes of Action

### 1.    Urban NY Has Alleged a Viable Claim for Breach of Contract, But Not As to Urban PA's Actions Solely in Connection With the Termination of the Parties' Relationship

Under Pennsylvania law, a breach of contract requires "[i] the existence of a contract, including its essential terms, [ii] a breach of a duty imposed by the contract, and [iii] resultant damages."  *Ware* v. *Rodale Press, Inc.,* 322 F.3d 218, 225 (3d Cir. 2003) (internal quotation marks omitted and alteration adopted) (quoting *CoreStates Bank, N.A.* v. *Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  Urban NY alleges various breaches, but not all satisfy the second element.  (*See* FAC ¶ 65).

On the first element, the Services Agreement is a binding contract that requires Urban PA to provide categories of administrative services using "reasonable commercial efforts" at a "quality comparable to the quality of such services that it maintains for its own operations." (Services Agreement ¶ 1(b); *see* FAC ¶¶ 31-39).  And on the third element, Urban NY alleges that Urban PA's actions caused Urban NY to pay for services that it did not receive and to experience reputational harm resulting from Urban PA's actions.  (*See* FAC ¶¶ 65-67, 90).  Whether Urban NY has a viable breach-of-contract claim thus turns on whether Urban NY has adequately alleged that Urban PA breach a duty imposed by the Services Agreement.

15

The Court finds it useful to separate Urban NY's allegations of breach into two categories. *First* are allegations related to the provision of services in the Services Agreement's enumerated categories. *Second* are allegations related to the facilitation of the parties' split that are not expressly addressed by the text of the Services Agreement. Urban NY's allegations in the first category support a breach-of-contract claim against Urban PA, but those in the second category do not.

Urban NY has alleged numerous actions by Urban PA that could amount to breaches of express terms of the Services Agreement. For example, Urban NY alleges that "Urban PA produced slow, incomplete, and inaccurate financial reports" and "failed to provide effective invoicing support for Urban NY," in violation of Sections 1(a)(i) and 1(a)(ii) of the Services Agreement. (FAC ¶ 65(a)). In support, Urban NY points to specific invoice mistakes that undermined Urban NY's relationship with a client. (*Id.*). Urban NY also alleges that Urban PA withheld Urban NY's access to certain software in violation of Section 3(a) of the Agreement, which requires Urban PA to make its records available to Urban NY. (*Id.*).

Separately, Urban NY points to Urban PA's (i) delays in paying Urban NY's subconsultants and employees (FAC ¶ 65(b)); (ii) restrictions on Urban NY's access to certain computers, email accounts, and information (*id.* ¶ 65(a), (c)); (iii) refusal to make Urban NY's personnel records available for an audit (*id.* ¶ 65(d)); (iv) restrictions on Urban NY's ability to draw on the parties' shared Line of Credit (*id.* ¶ 65(e)); and (v) failure to procure independent insurance or

16

provide business development services for Urban NY (*id.* ¶ 65(f)-(g)).[4]  The
Court holds that these allegations are sufficient to make out a claim for breach
of contract.[5]

There are other allegations, however, that relate not to Urban PA's
provision of services under the Services Agreement, but only to Urban PA's
actions in effectuating the termination of the parties' relationship.  These
include the allegations that Urban PA (i) "refus[ed] to migrate custody of payroll
processing as of December 1, 2024" (FAC ¶ 65(b)), and (ii) removed Urban NY's
information from the parties' shared website (*id.* ¶ 65(c)).[6]  As Urban PA points

---

[4]   The Side Letter specifies that "Urban [PA] agrees to take all such action as is necessary to cause [Urban NY] to be named as an insured under [Urban PA's] … insurance to the extent it is permitted to do so."  (Side Letter ¶ 4).  Urban PA argues that this provision bars Urban NY's claim based on Urban PA's alleged failure to procure independent insurance coverage for Urban NY because Urban PA only had to add Urban NY as an insured in its own policies.  (Def. Br. 15).

But Urban PA's argument ignores the text of the Services Agreement, which imposes steeper requirements on Urban PA regarding insurance than does the Side Letter.  (*Compare* Side Letter ¶ 4 (requiring Urban PA to add Urban NY "as an insured … to the extent it is permitted to do so"), *with* Services Agreement § 1(a)(ix) (requiring Urban PA to "secur[e]" various types of insurance coverage for Urban NY)).  As such, compliance with the Side Letter does not necessarily indicate that Urban PA has fully discharged its duties under the Services Agreement.

[5]   In so holding, the Court rejects Urban PA's argument that these allegations fail to allege a breach of the Services Agreement because "the Services Agreement does not require perfection."  (Def. Br. 14-15).  True enough — it only requires Urban PA to "use … reasonable commercial efforts to provide the services" at "a quality comparable to the quality of such services that [Urban PA] maintains for its own operations."  (Services Agreement § 1(b)).  But while the Court would prefer that Urban NY be more explicit about how Urban PA's actions fall short of that standard, it believes that the allegations, when taken together, are enough at this stage.  This is especially true because the question of reasonableness is best left to the jury.  *Cf. Sershen* v. *Cholish*, No. 3:07 Civ. 1011 (ARC), 2009 WL 5125242, at *14 (M.D. Pa. Dec. 17, 2009) (noting that under Pennsylvania law, "whether [a defendant in a tort action] acted reasonably is a question for the jury").

[6]   The Court recognizes that there are some allegations that do not fit neatly into a single bucket.  These include allegations related to the turning over of personnel records and the restrictions on Urban NY's ability to draw on its Line of Credit.  (*See* FAC ¶ 65(d)-(e)).  But given this early stage of the litigation, the Court will consider those allegations to support Urban NY's breach-of-contract claim.

out, the Services Agreement says nothing about either party's responsibilities in preparation for the contract's expiration, including with regard to data transfer. (Def. Br. 13; Services Agreement § 6 (noting how a party may terminate the Services Agreement but not discussing the procedures either party must follow to effectuate the termination)).

Consequently, the Court does not see how Urban NY's allegations pertaining solely to actions Urban PA took to terminate the parties' relationship constitute a breach of a duty imposed by the Services Agreement. Put another way, the Services Agreement does not obligate Urban PA to provide the transition services that Urban NY seeks. For example, while the Services Agreement provides that Urban PA "agrees to … perform" "[p]ayroll services" and "[i]nformation services" "for and on behalf of [Urban NY]" (Services Agreement § 1(a)(ii), (v)), it says nothing about data migration services and website placement (*see* Def. Br. 14).

Urban NY points out that the Services Agreement anticipates the provision of "other services" that Urban NY "may request from time to time" (Services Agreement § 1(b)), which could encompass transition services (Pl. Opp. 9-10). But even if true, the Court finds such a provision unenforceable because "it is far too vague and indefinite to form a binding contract." *Natale* v. *Winthrop Res. Corp.*, No. 07 Civ. 4686 (RLB), 2008 WL 2758238, at *8-9 (E.D. Pa. July 9, 2008) (declining to enforce a promise by the defendant to "do everything possible to assist" the plaintiff (internal quotation marks omitted)); *see Patel* v. *Kelly Servs., Inc.*, No. 22 Civ. 2421 (GJP), 2023 WL 2139828, at *6

18

(E.D. Pa. Feb. 21, 2023) ("A promise may be express or implied, but it will not be enforced if it is 'broad' or 'vague.'" (quoting *Dansko Holdings, Inc.* v. *Benefit Tr. Co.*, 991 F.3d 494, 500 (3d Cir. 2021))).

Indeed, "[t]he uncertainty of the promise creates no basis on which the court could determine whether the agreement has been kept or broken." *Natale*, 2008 WL 2758238, at *9. Adopting Urban NY's interpretation could "hold Defendant liable" for not providing services "in every conceivable manner." *Id.* Consequently, Urban NY cannot properly allege that Urban PA breached the Services Agreement with respect to actions that it took to facilitate the termination of the parties' relationship, unless those actions prevented Urban PA from providing the enumerated services that the Services Agreement obligated it to provide.[7]

### 2. Urban NY Has Not Alleged a Viable Claim for Breach of an Implied-in-Fact Contract

Urban NY's next claim is that Urban PA breached the parties' Labor Sharing Arrangement when it "refused to continue providing labor on [Urban NY]'s projects," including those that had already begun, "unless [Urban NY] agreed to certain terms demanded by [Urban PA]." (FAC ¶¶ 92-98). The Court dismisses this claim based on New York's statute of frauds doctrine.

### a. New York Law Applies to the Labor Sharing Arrangement

The Court begins with the threshold issue of whether New York or Pennsylvania law governs. "A federal court exercising diversity jurisdiction

---

[7]    The Court notes that the MOU may ultimately prove relevant in determining the scope of Urban NY's breach-of-contract claim.

19

must apply the choice of law analysis of the forum state." *Beth Isr. Med. Ctr.* v. *Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 582 (2d Cir. 2006) (citing *Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).  Under New York law, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (1993).  In this case, the answer to that inquiry is likely yes because, as discussed below, New York's statute of frauds bars Urban NY's claim here, though Pennsylvania's would not.[8]

Urban NY argues for the application of New York law.  (*See* Pl. Opp. 12). Ironically, while this position is correct, it also dooms Urban NY's claim.  In contract cases, New York courts apply "the 'center of gravity' or 'grouping of contracts' analysis ... in choice of law situations." *Beth Isr. Med Ctr.*, 448 F.3d at 583 (quoting *In re Allstate Ins. Co.*, 81 N.Y.2d at 226).  This "theory allows a court to consider a 'spectrum of significant contacts.'" *Id.* (quoting *In re Allstate Ins. Co.*, 81 N.Y.2d at 225-26).  Relevant factors include "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." *In re Allstate Ins. Co.*, 81 N.Y.2d at 227 (citing Restatement (Second) of Conflict of Laws, § 188(2) (1971)).

---

8    Unlike New York and most other jurisdictions, "Pennsylvania has no law requiring parties to memorialize contracts that they cannot perform within one year." *Gallagher* v. *Med. Rsch. Consultants, LLP*, No. 04 Civ. 236 (SRD), 2004 WL 2223312, at *3 (E.D. Pa. Oct. 1, 2004) (collecting cases).

20

Here, one party is domiciled in New York and one in Pennsylvania, and the alleged arrangement was bilateral. (FAC ¶¶ 20, 93-94). Even so, New York qualifies as the center of gravity because the Labor Sharing Arrangement most commonly involved Urban NY lending labor for Urban PA's projects in New York. Indeed, the Side Letter indicates that "Urban [PA] is not licensed to practice engineering in New York," so it relied heavily on Urban NY's labor for projects in New York. (Side Letter 1). Conversely, there is no evidence of any Urban NY projects outside of New York, meaning that the Labor Sharing Arrangement was likely performed mostly in New York. As such, the Court holds that New York has more significant contacts than Pennsylvania regarding the Labor Sharing Arrangement. *See Beth Isr. Med Ctr.*, 448 F.3d at 582-83. Because New York has "the most significant relationship to the transaction and the parties," its law applies. *Zurich Ins. Co.* v. *Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317 (1994) (internal quotation marks omitted) (quoting Restatement (Second) of Conflict of Laws, § 188(1)).[9]

### b. The Statute of Frauds Bars Any Claim That Urban PA Violated the Labor Sharing Arrangement

In New York, "a contract implied in fact[ ] rests upon the conduct of the parties and not their verbal or written words." *Parsa* v. *State of New York*, 64

---

[9]    The Court declines to hold that New York law would apply to all disputes arising between the parties, however, because the center of gravity of different causes of action may be in different places. *See Niedernhofer* v. *Wittels*, No. 17 Civ. 4451 (NSR), 2018 WL 3650137, at *4 n.7 (S.D.N.Y. July 31, 2018) ("Choice of law analysis under New York law is typically conducted separately for each claim, under a doctrine known as dépeçage." (collecting cases)). This is especially true given that, as discussed above, the Court's determination that New York law applies to the Labor Sharing Arrangement stems from factors specific to that arrangement.

21

N.Y.2d 143, 148 (1984). Yet even though an implied-in-fact contract involves no express agreement, a party must still "allege sufficient facts to establish 'an offer, acceptance of the offer, consideration, mutual assent, and intent to be bound.'" *Jinno Int'l Co.* v. *Premier Fabrics, Inc.,* No. 12 Civ. 7820 (LGS), 2013 WL 4780049, at *2 (S.D.N.Y. May 24, 2013) (quoting *Register.com, Inc.* v. *Verio, Inc.,* 356 F.3d 393, 427 (2d Cir. 2004)).

Here, however, the Court need not discuss whether Urban NY has successfully alleged that the Labor Sharing Arrangement qualifies as an implied-in-fact contract because such a claim is barred by the statute of frauds. (*See* Def. Br. 17 n.5; Def. Reply 6). Even though the statute of frauds is an affirmative defense, "[u]nder New York law, a party may properly move for judgment dismissing one or more causes of action on the ground that the cause of action may not be maintained because of the Statute of Frauds." *Mitchell* v. *Faulkner*, No. 10 Civ. 8173 (LAP), 2013 WL 150254, at *4 (S.D.N.Y. Jan. 15, 2013) (citing *Anostario* v. *Vicinanzo*, 59 N.Y.2d 662 (1983)), *aff'd*, 531 F. App'x 136 (2d Cir. 2013) (summary order); *accord Andrews* v. *Sony/ATV Music Pub'g, LLC,* No. 15 Civ. 7544 (AJN), 2017 WL 770614, at *6 (S.D.N.Y. Feb. 24, 2017); *Zeising* v. *Kelly*, 152 F. Supp. 2d 335, 343 (S.D.N.Y. 2001); *Goldberg* v. *Bespoke Real Estate LLC*, No. 23 Civ. 5614 (JPO), 2024 WL 1256006, at *5 (S.D.N.Y. Mar. 25, 2024).

Under New York's statute of frauds, an "agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith … if such

22

agreement, promise or undertaking … [b]y its terms is not to be performed within one year from the making thereof." N.Y. Gen. Oblig. Law § 5-701(a)(1). Given that a contract implied in fact is a "true contract," *Parsa*, 64 N.Y.2d at 148, the statute of frauds applies, *see Ellis* v. *Provident Life & Accident Ins. Co.*, 3 F. Supp. 2d 399, 409 (S.D.N.Y. 1998) ("Under New York law, the Statute of Frauds is an available defense even against implied-in-fact contract claims."); *Am. Fed. Grp., Ltd.* v. *Rothenberg*, 136 F.3d 897, 909 (2d Cir. 1998) (applying the statute of frauds to an "implied covenant"); *Alsayer* v. *Omnix Labs, Inc.*, Nos. 25-331 (L), 25-461 (XAP), 2026 WL 682344, at *2 (2d Cir. Mar. 11, 2026) (assuming that, if the "implied agreement" at issue was a type of agreement covered by Section 5-701(a), the statute of frauds would apply).

The inquiry here is thus (i) whether the alleged contract implied in fact could be performed within a year, and, if not (ii) whether there was a "writing … subscribed by the party to be charged therewith." N.Y. Gen. Oblig. Law § 5-701(a). As Urban NY appears to acknowledge, the answer to both questions is no, meaning that the statute of frauds bars Urban NY's claim. (*See* Pl. Opp. 12-14 (discussing the elements of the claim without responding to Urban PA's statute of frauds defense)).

The Labor Sharing Arrangement, as pleaded, cannot be performed within a year. The alleged terms require the parties to provide labor for the other party's projects, an arrangement that, as alleged, extended indefinitely. (FAC ¶¶ 20, 93-95, 97). As the Second Circuit stated, "[a] contract of indefinite duration, lacking a provision for a party to terminate the contract other than by

23

breaching it, cannot be performed within one year of its making."  *Grasso* v.

*Donnelly-Schoffstall*, No. 21-1021, 2022 WL 728839, at *2 (2d Cir. Mar. 11,

2022) (summary order) (citing *D&N Boening, Inc.* v. *Kirsch Beverages, Inc.*, 63

N.Y.2d 449, 457 (1984)).

The answer might be different if Urban NY had pleaded different implied-

in-fact contracts for specific projects, each of which was performable within a

year, or if it had pleaded that the Labor Sharing Agreement was terminable

within a year through means other than breach.  *See Ohanian* v. *Avis Rent A

Car Sys., Inc.*, 779 F.2d 101, 106-07 (2d Cir. 1985) (collecting cases and

explaining that the statute of frauds does not bar contracts that may be

terminated at will within a year or those that have even the slightest possibility

of performance within a year).  But Urban NY makes no such allegations.

Instead, it implies that the Labor Sharing Agreement was *not* terminable

because Urban PA "breached" by "refus[ing] to continue providing labor."  (FAC

¶ 97).  And Urban NY further provides no allegations about agreements

regarding specific projects.  (*See id.* (referring generally to "Plaintiff's projects"

without specifying which ones)).  In fact, the only specific project that Urban NY

mentions "runs through 2030" and thus cannot be performed in a year.  (*Id.*

¶ 16).

Given that the Labor Sharing Agreement could not, by its alleged terms,

be performed within a year, the statute of frauds requires there to be a writing

for it to be enforceable.  Here, Urban NY has not alleged that such a writing

exists.  (*See* FAC ¶ 20 (calling the Labor Sharing Agreement a "course of

dealing")).  In fact, a contract implied in fact is, by definition, unwritten.  *Parsa*, 64 N.Y.2d at 148.  (*See also* FAC ¶ 93 (indicating that the Labor Sharing Arrangement was a "course of dealing")).  Consequently, New York's statute of frauds bars Urban NY's claim that Urban PA breached the Labor Sharing Agreement.

### 3.  Urban NY Cannot Allege an Independent Claim for Breach of the Duty of Good Faith and Fair Dealing

Urban NY's third cause of action, which alleges a breach of the duty of good faith and fair dealing, returns to the Services Agreement, so Pennsylvania law applies.  *See ARS Kabirwala, LP* v. *El Paso Kabirwala Cayman Co.*, No. 16 Civ. 6430 (GHW), 2017 WL 3396422, at *3 (S.D.N.Y. Aug. 8, 2017) ("Choice-of-law provisions that govern a contract also govern related claims for breach of the implied covenant of good faith and fair dealing." (citing *Comprehensive Habilitation Servs., Inc.* v. *Commerce Funding Corp.*, No. 05 Civ. 9640 (PKL), 2009 WL 935665, at *10 n.14 (S.D.N.Y. Apr. 6, 2009))).  Pennsylvania recognizes a contractual duty of good faith and fair dealing requiring "honesty in fact in the conduct or transaction concerned." *Somers* v. *Somers*, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992) (internal quotation marks omitted and alteration adopted) (quoting 13 Pa. Cons. Stat. § 1201).  Bad faith may involve "evasion of the spirit of the bargain" and "interference with … the other party's performance." *Id.* (citing Restatement (Second) of Contracts § 205(d)).

Urban NY asserts that Urban PA breached this duty by exploiting its right to access `and manage Urban NY's administrative infrastructure under the Services Agreement.  (FAC ¶¶ 101-102).  Specifically, Urban NY alleges that

Urban PA used its power to harm Urban NY's customer relationships, interfere with its operations, restrict access to shared financing, and coerce concessions from Urban NY as the parties terminated their contractual relationship.  (*Id.* ¶¶ 5, 65, 67, 70, 72, 102, 121).  These allegations make out viable claims that Urban PA acted in bad faith when performing the contract.  *See Somers*, 613 A.2d at 1213.

But the tougher question, and the one on which Urban PA focuses its motion, is whether these allegations can support an independent cause of action, or whether they are subsumed by Urban NY's breach-of-contract claim. The Court recognizes that the case law on this question in Pennsylvania is unclear and somewhat contradictory.

On one hand, as Urban PA points out (Def. Br. 17-18), the Third Circuit has established a firm rule "that Pennsylvania does not allow an action for breach of the covenant of good faith and fair dealing separate from a breach of contract claim," *Landan* v. *Wal-Mart Real Estate Bus. Tr.*, 775 F. App'x 39, 42-43 (3d Cir. 2019) (unpublished opinion) (collecting cases); *see also Davis* v. *Wells Fargo*, 824 F.3d 333, 352 (3d Cir. 2016) ("Under Pennsylvania law, a claim for breach of the implied covenant of good faith and fair dealing is subsumed in a breach of contract claim." (internal quotation marks omitted and alteration adopted) (quoting *Burton* v. *Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013))).  The Pennsylvania Supreme Court confirmed this rule in the context of contracts for goods.  *See Hanaway* v. *Parkesburg Grp., LP*, 168 A.3d

26

146, 157 (Pa. 2017) (noting that "under the UCC, a breach of the duty of good faith does not create a separate cause of action").

On the other hand, Urban NY finds support for the proposition that Pennsylvania law does not "bar[ ] a plaintiff from bringing a cause of action for breach of contract and a cause of action for breach of the duty of good faith and fair dealing when those two actions are based on separate conduct." *Lomma* v. *Ohio Nat'l Life Assurance Corp.*, 283 F. Supp. 3d 240, 266 (M.D. Pa. 2017) (citing *Clunie-Haskins* v. *State Farm Fire & Cas. Co.*, 855 F. Supp. 2d 380, 388 (E.D. Pa. 2012)).

Considering both positions, the Court follows the Third Circuit's bright-line rule as opposed to the more permissive rule of *Lomma*, though it recognizes that at some point in the future, the Pennsylvania Supreme Court may well disagree. The Court cannot ignore the fact that Urban NY finds support for the *Lomma* rule in only two Pennsylvania federal district court cases, one of which predates the relevant Third Circuit rulings, *see Ross* v. *Can. Life Assurance Co.*, No. 94 Civ. 5557 (LAR), 1996 WL 182561, at *7 (E.D. Pa. Apr. 16, 1996), and one case from a South Carolina federal district court that considered New York, Vermont, and Pennsylvania law together and declined to decide if the claim could go forward independently "because the implied covenant theory would survive as embedded within [the breach-of-contract cause of action] in any event," *see In re TD Bank, N.A.*, 150 F. Supp.

3d 593, 627 (D.S.C. 2015).  The case law support for Urban NY's position is notably threadbare.[10]

As such, the Court holds that Urban NY cannot maintain an independent cause of action for a breach of the duty of good faith and fair dealing.  Still, the Court agrees with the analysis of the South Carolina district court and finds similarly that Urban NY's allegations of bad faith "survive as embedded within" Urban NY's breach-of-contract cause of action.  *In re TD Bank, N.A.*, 150 F. Supp. 3d at 627.  Indeed, the same Third Circuit case law that prevents Urban NY from raising an independent claim under the duty of good faith and fair dealing makes clear that "arguments concerning bad faith should be addressed in connection with [the plaintiff's] surviving breach of contract claim."  *Davis*, 824 F.3d at 352.

### 4.     Urban NY Has Not Alleged a Viable Economic Duress Claim

Urban NY next alleges a claim for economic duress based on Urban PA allegedly coercing Urban NY to enter into the MOU.  (FAC ¶¶ 104-108).  The MOU does not have a choice-of-law provision.  (*See generally* MOU).  The parties appear to agree that this claim would fail under Pennsylvania law because Urban NY was represented by counsel when negotiating the MOU.  (*See* Def. Br. 9-10; Pl. Opp. 15).  *See Degenhardt* v. *Dillon Co.*, 669 A.2d 946,

---

[10]     Even if the Court were to adopt the *Lomma* rule, it is unclear whether Urban NY has alleged an independent breach of the duty of good faith and fair dealing, especially because the actions it argues breached the duty are similar to those that undergird its breach-of-contract claim.  (*Compare* FAC ¶ 90 (describing various alleged breaches of the Services Agreement), *with id.* ¶¶ 101-102 (describing similar breaches of the duty of good faith and fair dealing, while couching them as being a result of Urban PA "exploit[ing]" its "access [to] and custody" over Urban NY's "administrative and operational infrastructure")).

951 (Pa. 1996) ("[T]here can be no duress where the contracting party is free to come and go and to consult with counsel before assuming new contractual obligations.").

The Court need not do a choice-of-law analysis, however, because Urban NY's claims fail under New York law as well. *In re Allstate Ins. Co.*, 81 N.Y.2d at 223 ("The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved."). To make out a claim of economic duress under New York law, a plaintiff "shoulders a heavy burden" and must allege that the "agreement was procured by means of [i] a wrongful threat that [ii] precluded the exercise of its free will." *Mandavia* v. *Columbia Univ.*, 912 F. Supp. 2d 119, 127 (S.D.N.Y. 2012) (internal quotation marks omitted) (first quoting *Davis & Assocs., Inc.* v. *Health Mgmt. Servs., Inc.*, 168 F. Supp. 2d 109, 114 (S.D.N.Y. 2001); then quoting *Interpharm, Inc.* v. *Wells Fargo Bank, Nat'l Assn.*, 655 F.3d 136, 142 (2d Cir. 2011)), *aff'd*, 556 F. App'x 56 (2d Cir. 2014) (summary order).

Urban NY alleges that because it depended on Urban PA to provide "administrative and operational infrastructure," it was "force[d] … to agree to additional hourly fees for transition services and the MOU." (FAC ¶ 105). Urban NY also identifies Urban PA's "threat[ ]" to stop providing "information, data, and materials" to Urban NY if it did not "agree[ ] to such terms." (*Id.* ¶ 106). These allegations, together with the surrounding context, do not rise to the level of economic duress because Urban PA's actions — even if wrongful — did not override Urban NY's free will as a matter of law.

29

The Court begins by recognizing the importance to Urban NY's operations of the data and information that Urban PA allegedly withheld from Urban NY. (*See* Pl. Opp. 16-17).  But the unique procedural history before this Court belies Urban NY's claim that it made any decision under duress.  Urban NY filed the complaint in this case, along with a request for emergency relief, on August 19, 2024.  (Dkt. #1, 4-7).  On August 20, 2024, the Court entered a Stipulation and Order that required Urban PA to continue funding Urban NY's payroll, retirement contributions, and subconsultants.  (Dkt. #13).  The parties agreed that no emergency relief was necessary.  (Dkt. #13, 16).  Then, on September 26, 2024, the Court entered another Stipulation and Order under which the parties further "agree[d] to maintain the status quo by performing their respective obligations under the Services Agreement."  (Dkt. #18 ¶ 1). Only after that, on December 17, 2024, did the parties enter into the MOU. (FAC ¶ 72).

In other words, by the time Urban NY entered into the MOU, the Court had already ordered Urban PA — twice — to continue providing services under the Services Agreement, and Urban NY had already both requested emergency relief and withdrawn that request.  Urban NY appears to believe that this background *supports* its claim for duress (Pl. Opp. 17), but it has the opposite effect.

Urban NY could have — and indeed knew how to — come to this Court for emergency relief or a contempt proceeding, a viable alternative that precludes its claim of duress.  *See Interpharm, Inc.* v. *Wells Fargo Bank, N.A.,*

No. 08 Civ. 11365 (RJH), 2010 WL 1257300, at *11 (S.D.N.Y. Mar. 31, 2010) ("One cannot successfully claim duress as a defense to a contract when he had an alternative to signing the agreement." (internal quotation marks omitted and alteration adopted) (quoting *Reid* v. *IBM Corp.*, No. 95 Civ. 1755 (MBM), 1997 WL 357969, at *7 (S.D.N.Y. June 26, 1997))), *aff'd*, 655 F.3d 136.  If the ability to file for bankruptcy dooms an economic duress claim, which the *Interpharm* court found, *see* 2010 WL 1257300, at *11, so too does the ability to file a letter with a Court already supervising a dispute (Def. Reply 2).

Urban NY is a sophisticated corporate entity that "was advised at all times by able counsel and [that] had adequate legal remedies available ... if [it] wanted to prevent [Urban PA] from violating" the Services Agreement and the Court's August 20, 2024 and September 26, 2024 Orders.  *See Neuman* v. *Pike*, 591 F.2d 191, 193-94 (2d Cir. 1979).  As the Second Circuit stated, "[a] threatened breach of contract for which there are adequate legal remedies does not constitute duress." *Id.* at 194.  Such is the case here, and thus Urban NY has not alleged a plausible claim of economic duress.[11]

---

[11]     Urban NY contests this conclusion by saying that the legal remedies available "do[ ] not constitute ... reasonable alternative[s]." (Pl. Opp. 17 (citing *Hornstein* v. *Paramount Pictures*, 37 N.Y.S.2d 404, 416 (N.Y. Sup. Ct. 1942))).  But the case Urban NY cites in support is a New York trial court case from 1942, and that case indicated that a legal remedy's "theor[etical]" availability was insufficient only if that legal remedy could not be "immediately effective." *Hornstein*, 37 N.Y.S.2d at 416.  Here, however, Urban NY had legal remedies available that would have been immediately effective.  In fact, it had already drafted a complaint, filed it in this Court, moved for emergency relief, and withdrawn that motion.  It could have simply advised the Court of the situation and been immediately heard, well before the termination of the Services Agreement.

### 5.    Urban NY Has Alleged a Viable Claim for Declaratory Judgment

Urban NY next seeks declaratory relief stating that Urban NY does not owe the Report Balance or any other administrative or professional or labor costs to Urban PA for the 2014-2024 period.  (FAC ¶¶ 109-116).  To state a claim for declaratory relief, a plaintiff must show "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Red Fort Cap. Inc.* v. *Guardhouse Prods. LLC*, 397 F. Supp. 3d 456, 473 (S.D.N.Y. 2019) (internal quotation marks omitted) (quoting *Md. Cas. Co.* v. *Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  The FAC meets this standard.

A substantial controversy exists with competing legal interests because the parties dispute the validity of the Report Balance, which Urban PA wishes Urban NY to pay.  The dispute boils down to the following:  Urban NY claims that the Report Balance eschews the parties' historical agreements and course of dealing, including their practice of excluding overhead costs from the "total cost" calculation under Section 2(a) of the Services Agreement.  (FAC ¶¶ 55-56).  Urban PA, on the other hand, argues that there is no controversy, and seeks dismissal because Urban NY's claim supposedly contravenes the text of the Services Agreement, whose language about "total costs" must include overhead costs.  (Def. Br. 18-20).

The Court declines to dismiss Urban NY's claim because which party is right depends on a factual dispute that cannot be judged on a motion to dismiss.  The Court reaches this conclusion for two reasons.  *First*, and most

importantly, the contract is more ambiguous than Urban PA admits.  It provides that Urban NY "compensate Urban [PA] *for all services rendered hereunder* in an amount equal to the *total costs* of Urban [PA] in providing such or similar services for itself … multiplied by a fraction."  (Services Agreement § 2(a) (emphasis added)).

Urban PA focuses on the "total costs" language, which it claims unambiguously includes overhead costs.  (Def. Br. 18-20).  But the Court notes that the "total costs" only refer to the "services rendered hereunder" (Services Agreement § 2(a)), and it is ambiguous whether overhead costs qualify as services rendered under the Services Agreement.  Given the ambiguity in the language of the contract, the Court must look outside the text to construe its meaning.  *See Atl. Richfield Co.* v. *Razumic*, 390 A.2d 736, 741 n.6 (Pa. 1978) (noting that when interpreting an agreement, "[t]he parties to [that] agreement know best what they meant, and their action under it is often the strongest evidence of their meaning" (internal quotation marks omitted and first alteration in original)); *Time Warner Cable of N.Y.C.* v. *City of New York*, 943 F. Supp. 1357, 1390 (S.D.N.Y. 1996) ("rely[ing] on parol evidence not to vary or add to the terms of the contract, but only to interpret and give effect to the parties' intent").  It declines to do so at this stage.

*Second*, Urban NY argues that the account stated doctrine bars any Urban PA claim for additional amounts beyond what it already invoiced, which may be a viable argument.  (Pl. Opp. 18).  *See, e.g.*, *In re Rockefeller Ctr. Props.*, 46 F. App'x 40, 43 (2d Cir. 2002) (summary order) ("[U]nder the doctrine of

account stated, a party receiving an account is obligated to inspect it, and if that party 'admits it to be correct, it becomes a stated account and is binding on both parties.'" (quoting *Kramer, Levin, Nessen, Kamin & Frankel* v. *Aronoff*, 638 F. Supp. 714, 719 (S.D.N.Y. 1986))); *Richburg* v. *Palisades Collection LLC*, 247 F.R.D. 457, 465 (E.D. Pa. 2008) (explaining that an account stated is an agreement whereby "[t]he parties agree to a consolidated statement of debt" and "give up their right to bring suit on any of the underlying debts").

The Court will not make a final determination as to whether this doctrine governs, especially given how little the parties briefed it.  But the Court still believes that it may be relevant for assessing the Report Balance.  As such, at least for now, Plaintiff has alleged a viable claim for a declaration that it does not owe the Report Balance or anything on top of it.

### 6. Urban NY Has Alleged a Viable Claim for Tortious Interference with Prospective Economic Advantage

To establish a claim of tortious interference with prospective economic advantage under New York law, "the plaintiff must allege that '[i] it had a business relationship with a third party; [ii] the defendant knew of that relationship and intentionally interfered with it; [iii] the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and [iv] the defendant's interference caused injury to the relationship.'" *Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (quoting *Carvel Corp.* v. *Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)).

Similarly, under Pennsylvania law, tortious interference with prospective economic advantage requires "[i] the existence of a contractual, or prospective

34

contractual relation between the complainant and a third party; [ii] purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; [iii] the absence of privilege or justification on the part of the defendant; and [iv] the occasioning of actual legal damage as a result of the defendant's conduct." *Assembly Tech. Inc.* v. *Samsung Techwin Co., Ltd.*, 695 F. Supp. 2d 168, 171 (E.D. Pa. 2010) (internal quotation marks omitted) (quoting *CGB Occupational Therapy, Inc.* v. *RHA Health Servs. Inc.*, 357 F.3d 375, 384 (3d Cir. 2004)).[12]

Urban NY raises a claim for tortious interference with prospective economic advantage stemming from Urban PA's alleged statements to Urban NY's prospective business partners, including the Port Authority, conveying that Urban NY could not perform projects going forward, as well as the withdrawal of supporting labor on existing projects and the withholding of payments to Urban NY's subcontractors. (FAC ¶¶ 117-123). Those actions allegedly caused Urban NY to lose out on projects with the Port Authority, the New York City School Construction Authority, the Metropolitan Transportation Authority, and Lothrop Associates Architects, among others. (*Id.* ¶¶ 118, 122).

Urban PA appears to concede that Urban NY has adequately pleaded a business relationship with a third party (*see* Def. Br. 21-22), but it offers at least three arguments why the FAC's allegations do not give rise to tortious

---

[12]     Again, no choice-of-law conflict exists, so the Court need not make a final determination as to whether Pennsylvania or New York law governs. *See In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (1993).

interference.  The Court addresses them in turn, ultimately finding each to be unsuccessful.

### a. Urban NY Has Alleged Sufficiently Wrongful Conduct by Urban PA

Urban PA posits that its actions properly alleged are not wrongful under either New York or Pennsylvania law.  (Def. Br. 21-22).  As a preliminary matter, it urges the Court to disregard as conclusory Urban NY's allegation concerning Urban PA's conversations with Urban NY's prospective business partners.  (*Id.*).  But that allegation is not conclusory, and the Court may credit facts pleaded "upon information and belief."  *E.g.*, *Safety Mgmt. Sys., Inc.* v. *Safety Software Ltd.*, No. 10 Civ. 1593 (RJH), 2011 WL 498313, at *1 (S.D.N.Y. Feb. 10, 2011) (citing Fed. R. Civ. P. 11(b)).  That is especially true when, as here, "the facts are peculiarly within the possession and control of the defendant."  *Moreira* v. *Société Générale, S.A.*, 125 F.4th 371, 395 (2d Cir. 2025) (internal quotation marks omitted) (quoting *Citizens United* v. *Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2019)).

The meat of Urban PA's argument is that Urban NY's allegations are insufficient because it has not alleged an independent crime or tort.  (Def. Br. 21-22).  But considering the totality of Urban NY's pleading, the Court finds sufficient allegations of wrongdoing.  Urban NY claims that Urban PA exploited its access to Urban NY's data, information, and customers to undermine Urban NY's current projects and prevent the development of further business relationships.  (FAC ¶¶ 65, 118-121).

36

That is enough at this stage.  Indeed, sister courts in this District have allowed tortious interference claims to go forward on substantially similar allegations.  *See Sidney Frank Importing Co., Inc.* v. *Beam Inc.*, 998 F. Supp. 2d 193, 212-14 (S.D.N.Y. 2014) (denying a motion to dismiss a tortious interference claim when the plaintiff alleged that the defendant made misrepresentations about the plaintiff's brand to specific distributors); *Cereus Prod. Dev., Inc.* v. *Boom LLC*, No. 14 Civ. 4292 (PAC), 2015 WL 3540827, at *7 (S.D.N.Y. June 5, 2015) (denying a motion to dismiss a tortious interference claim based on allegations that the defendants spoke to a third party, "pitched their business based on information improperly gleaned from Plaintiff, and made misleading statements regarding the stability of Plaintiff's business").

### b.    Urban NY's Tortious Interference Claim Is Not Duplicative of Its Breach-of-Contract Claim

*Second*, Urban PA argues that Urban NY's tortious interference claim is duplicative of its breach of contract claim, so it should be dismissed under the economic loss doctrine and Pennsylvania's gist-of-the-action doctrine.  (Def. Br. 21-22).  But Urban NY's tortious interference claim, while arguably arising out of its contractual relationship with Urban PA, remains collateral to the contract.  *See Cereus Prod. Dev.*, 2015 WL 3540827, at *7 ("Plaintiff may proceed with tort claims in addition to its breach of contract claim because it has alleged tortious conduct collateral to the contract."); *Frank C. Pollara Grp., LLC* v. *Ocean View Inv. Holding, LLC*, 784 F.3d 177, 186 (3d Cir. 2015) (noting that the gist-of-the-action doctrine does not apply if a plaintiff "point[s] to independent events giving rise to the tort").

37

Here, Urban PA's alleged misstatement to Urban NY's prospective business partners does not implicate any contract at all.  And the Court agrees that Urban NY's tortious interference claim stems not from alleged breaches of the Services Agreement, but rather from alleged misuse of access and information.  While these allegations are related to the contractual violations Urban NY raises, *see supra* B.1, they are better described as "collateral" and can thus support a tort claim, *see Cereus Prod. Dev.*, 2015 WL 3540827, at *7.[13]

### c.    Urban PA Alleged Actions Proximately Caused Urban NY's Injury

Finally, Urban PA suggests that Urban NY has not alleged that Urban PA's conduct was the proximate cause of any supposed lost business opportunity.  (Def. Reply 9).  But that is also untrue.  Urban NY alleges that certain entities "routinely invite[d] [Urban NY] to submit bids for project work based on [its] superior past performance and reputation," but that Urban NY "lost out on or was not invited" by those entities "to bid on [future] opportunities" due to Urban PA's actions.  (FAC ¶¶ 120, 122).  That is a sufficient allegation of causation.  At this stage, the Court thus holds that Urban NY has alleged a viable claim for tortious interference with prospective economic advantage.

---

[13]    Had the Court held otherwise, it would likely have had to do a choice-of-law analysis because New York law does not have a gist-of-the-action doctrine, and its economic loss doctrine "does not have application beyond the products liability context," *Milestone Aviation Grp. Ltd.* v. *DSV Air & Sea Inc.*, No. 24 Civ. 3136 (JPC), 2025 WL 846142, at *3 (S.D.N.Y. Mar. 18, 2025) (internal quotation marks omitted) (quoting *IKB Int'l, S.A.* v. *Wells Fargo Bank, N.A.*, 40 N.Y.3d 277, 290 (2023)).

### 7.    Urban NY Has Not Alleged a Viable Claim for Common-Law Unfair Competition

"The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Jeffrey Milstein, Inc.* v. *Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995) (internal quotation marks omitted and alteration adopted) (quoting *Rosenfeld* v. *W.B. Saunders, A Div. of Harcourt Brace Jovanovich, Inc.*, 728 F. Supp. 236, 249-50 (S.D.N.Y. 1990)). "The Pennsylvania Supreme Court has not defined the elements of a common law unfair competition claim." *Harbor Bus. Compliance Corp.* v. *Firstbase.io, Inc.*, 152 F.4th 516, 527 (3d Cir. 2025). But similar to New York, "the essential element is 'passing off the goods for one of that of another.'" *Id.* (quoting *Goebel Brewing Co.* v. *Esslingers, Inc.*, 95 A.2d 523, 526 (Pa. 1953)). Lower courts in Pennsylvania have stated that the claim "encompasses trademark infringement, but also includes a broader range of unfair practices, which may generally be described as a misappropriation of the skill, expenditures and labor of another." *Penn. State Univ.* v. *Univ. Orthopedics, Ltd.*, 706 A.2d 863, 867 (Pa. Super. 1998).

A key component of "misappropriation" is that the defendant *used* what is the plaintiff's. *See Misappropriation*, Black's Law Dictionary (12th ed. 2024) (defining misappropriation as "[t]he application of another's property or money dishonestly to one's own *use*" (emphasis added)); *Sidney Frank Importing Co.*, 998 F. Supp. 2d at 208-09 ("Misappropriation … 'concerns the taking and *use* of the plaintiff's property to compete against the plaintiff's own use of the same

39

property.'" (emphasis added) (quoting *ITC Ltd.* v. *Punchgini, Inc.*, 9 N.Y.3d 467, 478 (2007))); *Roy Exp. Co. Establishment of Vaduz* v. *Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) ("An unfair competition claim involving misappropriation usually concerns the taking and *use* of the plaintiff's property to compete against the plaintiff's own use of the same property[.]" (emphasis added)).

Urban NY asserts that Urban PA engaged in unfair competition through the actions described above. (FAC ¶¶ 124-128). The supposed misappropriation includes Urban PA "leveraging its access to and custody of Plaintiff's administrative and operational infrastructure under the Services Agreement, withdrawing labor on ongoing projects, intentionally conveying the conclusions of the Report to M&T Bank to prejudice Plaintiff's attempt to obtain financing, and disparaging Plaintiff in the marketplace." (*Id.* ¶ 126). But these allegations do not amount to misappropriation of Urban NY's skill, labor, or expenditures. *See Jeffrey Milstein, Inc.*, 58 F.3d at 34-35; *Penn. State Univ.*, 706 A.2d at 867. Specifically, some of Urban NY's proffered misappropriations do not identify anything that *belongs* to Urban NY, while others do not allege any *use* by Urban PA.

*First*, Urban NY's allegations that Urban PA withdrew its own labor, conveyed a report to a bank, and communicated with a third party about Urban NY's continued viability — while perhaps unlawful in other ways — have nothing to do with Urban NY's skill, labor, or expenditures. *See Gen. Sec., Inc.* v. *APX Alarm Sec. Sols., Inc.*, 647 F. Supp. 2d 207, 219 (N.D.N.Y. 2009)

40

("[P]laintiff's remaining allegations are limited to defendants' disparaging statements about plaintiff's products or services and therefore cannot form the basis of an unfair competition claim.").[14]

Urban NY has also not explained how its remaining allegation — that Urban PA "leverage[ed]" its access to Urban NY's operations — led to a misappropriation of Urban NY's skills, expenditures, or labor.  (FAC ¶ 126).  At most, Urban NY describes that Urban PA "took … profits"  and "pocketed hundreds of thousands of dollars" (Pl. Opp. 22), but profits are not skills, expenditures, or labor, and improperly retaining them amount to theft or a contract violation, but not unfair competition.  In sum, these alleged misappropriations cannot support a claim of unfair competition.

*Second*, Urban NY nowhere alleges that Urban PA *used* anything of Urban NY's to its own advantage, which is the crux of a misappropriation claim.  *See, e.g.*, *Sidney Frank Importing Co.*, 998 F. Supp. 2d at 208-09.  At bottom, Urban NY's allegations tell the story that Urban PA exploited its powerful position to undermine Urban NY's business operations.  But Urban

---

14      It is worth noting that "New York recognizes a tort of 'unfair competition by disparagement,' but a plaintiff asserting disparagement of goods as the basis for an unfair competition claim generally must allege and prove malice and special damages.'" *Fashion Boutique of Short Hills, Inc.* v. *Fendi USA, Inc.*, No. 91 Civ. 4544 (MGC), 1992 WL 170559, at *4 (S.D.N.Y. July 2, 1992) (citing, among others, *Payrolls & Tabulating, Inc.* v. *Sperry Rand Corp.*, 257 N.Y.S.2d 884, 886 (1st Dep't 1965)).  Urban NY has not brought such a claim here.  *Cf. Gen. Sec., Inc.* v. *APX Alarm Sec. Sols., Inc.*, 647 F. Supp. 2d 207, 219-20 (N.D.N.Y. 2009) (discussing unfair competition and product disparagement as two separate claims).  But even if it had, Urban NY does not appear to allege that Urban PA engaged in unfair competition out of malice.  (*See* FAC ¶ 121 (only using the word "malice" when alleging tortious interference)).

41

NY nowhere explains how Urban PA *used* for its own benefit anything belonging to Urban NY.

The closest assertion is that Urban PA "coopted Urban NY-hired and Urban NY-paid labor … on ongoing Urban NY projects." (Pl. Opp. 22).  But this is not misappropriation, because it related to "ongoing Urban NY projects," not Urban PA projects.  (*Id.*).  Nowhere in the FAC does Urban NY allege that Urban PA coopted anything from Urban NY for Urban PA's own benefit.  As such, Urban NY cannot raise an unfair competition claim.

### 8.    Urban NY Has Not Alleged a Viable Claim for Conversion

Under New York law, "[t]o plausibly allege a conversion claim, a plaintiff must show: [i] the property subject to conversion is a specific identifiable thing; [ii] plaintiff had ownership, possession or control over the property before its conversion; and [iii] defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Generation Next Fashions Ltd.* v. *JP Morgan Chase Bank, NA*, 698 F. Supp. 3d 663, 679 (S.D.N.Y. 2023) (internal quotation marks omitted) (quoting *Benex LC* v. *First Data Merch. Servs. Corp.*, No. 14 Civ. 6393 (JS) (AKT), 2016 WL 1069657, at *5 (E.D.N.Y. Mar. 16, 2016)).  Under Pennsylvania law, "[c]onversion is the deprivation of another's right of property in, use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *Sterling* v. *Redevelopment Auth. of Phila.*, 836 F. Supp. 2d 251, 270 (E.D. Pa. 2011) (emphasis removed and

internal quotation marks omitted) (quoting *Stevenson* v. *Econ. Bank of Ambridge,* 197 A.2d 721, 726 (Pa. 1964)).

Urban NY asserts a conversion claim by arguing that Urban PA "has improperly assumed dominion and control over" Urban NY's "property," which presumably refers to the data and information that Urban PA allegedly refused to turn over during the transition period.  (FAC ¶¶ 70, 130-132).  In response, Urban PA argues principally that under the Services Agreement, everything over which Urban NY asserts ownership actually belongs to Urban PA, so Urban NY has no conversion claim.  (Def. Br. 24-25).[15]  Based on the current allegations in the FAC, Urban PA is right.

The parties assert that three provisions of the Services Agreement are relevant.  *First,* Section 1(c) states that "management, control and direction of the operations and policies of [Urban NY] shall remain at all times under the exclusive control of … [Urban NY]."  (Services Agreement § 1(c)).  *Second,* Section 3(a) provides that "Urban [PA] shall keep accurate records and accounts of all services provided pursuant to this Agreement, including services provided by [Urban NY].  Such books and records … shall be available for inspection on reasonable prior notice by [Urban NY] and its representatives."  (*Id.* § 3(a)).  *Third,* Section 3(b) then specifies that "[a]ll such books and records shall be the property of Urban [PA]."  (*Id.* § 3(b)).

---

[15]    Urban PA also argues that Urban NY's conversion claim must be barred because it amounts to a breach-of-contract claim.  (Def. Br. 25).  But given that the Court held that the Services Agreement does not govern the process of terminating the parties' relationship, *see supra* B.1, that argument is unpersuasive.

Urban NY focuses extensively on the first provision (Pl. Opp. 9), but that is a red herring.  Section 1(c) only reserves for Urban NY control over its "operations and policies," not its documents and records.  (Services Agreement § 1(c)).  Sections 3(a) and 3(b) are operative here, and they indicate that (i) Urban PA was obligated to keep books and records to memorialize the services that either Urban PA or Urban NY performed under the Services Agreement, (ii) Urban PA owned those books and records, and (iii) Urban PA had to make those books and records available to Urban NY for inspection. (Services Agreement § 3(a)-(b)).

Reading the provisions together, Urban NY may not assert a conversion claim over records memorializing the services provided under the Services Agreement because those records belong to Urban PA.[16]  The Court is not saying that Urban PA necessarily owns *everything* that it possesses regarding Urban NY's operations.  The Court can envision a scenario in which Urban NY may have provided documents to Urban PA in its administrative role for safekeeping.  Those documents are not books and records that Urban PA maintained to memorialize a service provided, and thus Urban PA would not own them.  (*See* Services Agreement § 3(a)-(b)).

The problem here is that Urban NY has not sufficiently alleged that Urban PA is in possession of such documents.  Instead, Urban NY pursues

---

[16]   As to those records, Urban NY's better argument may be a simple breach-of-contract claim based on the Services Agreement provision indicating that Urban PA must make such records "available for inspection."  (*See* Services Agreement § 3(a)).  Indeed, the Court construes Urban NY to have made that argument above.  *See supra* B.1.

44

"accounting records, employee files, customer profiles, project records, and legal and risk information." (Pl. Opp. 9). Most of all, Urban NY seeks information on a "software database that functions as Urban NY's accounting database and general ledger." (FAC ¶ 65(a)).

Each of these sounds to the untrained ear like a record memorializing the provision of a service under the Services Agreement, which Urban PA would own. *See BNP Paribas Mortg. Corp.* v. *Bank of Am., N.A.*, Nos. 10 Civ. 8630 (RWS), 10 Civ. 8299 (RWS), 2011 WL 3847376, at *6 (S.D.N.Y. Aug. 30, 2011) ("It is an essential element of a claim for conversion … that a would-be plaintiff must either own the subject property or have a right to immediate possession of it." (collecting cases)). The Court thus must dismiss Urban NY's conversion claim as alleged.

### 9. Urban NY Has Not Alleged a Viable Claim for Unjust Enrichment

"The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates *in the absence of any agreement*." *LBA Int'l Ltd.* v. *C.E. Consulting LLC*, No. 08 Civ. 6797 (SAS), 2010 WL 778019, at *3 (S.D.N.Y. Mar. 5, 2010) (internal quotation marks omitted) (quoting *Beth Isr. Med. Ctr.*, 448 F.3d at 586-87). As the name implies, unjust enrichment "requires [i] an enrichment that [ii] was unjust." *Mack* v. *Pa. State Police*, 350 A.3d 1088 (Table), 2025 WL 3439945, at *13 (Pa. Commonw. Ct. 2025); *see also Precision Testing Lab'ys, Ltd.* v. *Kenyon Corp. of Am.*, 644 F. Supp. 1327, 1350 (S.D.N.Y. 1986) (similar).

45

To prove unjust enrichment under New York law, "a plaintiff must establish [i] that the defendant benefited; [ii] at the plaintiff's expense; and [iii] that equity and good conscience require restitution." *LBA Int'l Ltd.*, 2010 WL 778019, at *3 (internal quotation marks omitted) (quoting *Kaye* v. *Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).  Similarly, Pennsylvania law provides a remedy for unjust enrichment "when [i] one party confers a benefit on the recipient, [ii] the recipient appreciates that benefit, and [iii] the recipient accepts and retains the benefit under such circumstances that it would be inequitable or unjust for the recipient to retain the benefit without payment." *Se. Pa. Transp. Auth.* v. *Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 704 (E.D. Pa. 2015) (citing *Allegheny Gen. Hosp.* v. *Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000)).

Here, Urban NY argues that Urban PA was unjustly enriched through (i) Urban NY's "payment of interest on the parties' intercompany balance"; (ii) Urban PA's retention of "project profit that [Urban PA] otherwise would not have realized or received," and (iii) Urban NY's payment of "its allocation of prescription drug costs" without remittance.  (FAC ¶¶ 134-135).  These allegations fall short of alleging a viable claim.

On the first point, Urban NY alleges that Urban PA would pay Urban NY's costs and then "unilaterally charge Urban NY interest, despite the fact that Urban NY never expressly agreed to such practice or any interest terms."  (FAC ¶ 45).  The FAC provides no other details.  But this allegation is insufficient because Urban NY does not explain why charging such interest would be

inequitable, especially given that Urban PA was paying Urban NY's costs from "Urban PA's own operating account." (*Id.*).

On the third point, Urban NY provides no additional information beyond what was described above. This allegation is insufficient because Urban NY provides so little context that the Court initially wondered if the allegation had been inadvertently copied from a different pleading. (*See* FAC ¶ 135). And it, like the allegation above, lacks dates or amounts. What Urban NY alleges simply does not suffice. *See Washington* v. *Kellwood Co.*, No. 05 Civ. 10034 (DAB), 2009 WL 855652, at *11 (S.D.N.Y. Mar. 24, 2009) (dismissing an unjust enrichment claim when the plaintiff failed to "allege[ ] what Defendants unjustly gained"); *Sunlight Elec. Contracting Co., Inc.* v. *Turchi*, No. 08 Civ. 5834 (SRD), 2011 WL 4086077, at *16 (E.D. Pa. Sept. 13, 2011) (dismissing an unjust enrichment claim when the plaintiff did not explain how defendants received an unjust benefit).

On the second point, Urban NY alleges that Urban PA "retained profits" on two projects between 2020 and 2022 that Urban NY spearheaded. (FAC ¶¶ 47-48). This allegation is closer but ultimately fails for similar reasons. Urban NY provides no explanation for why Urban PA's retention of profits for either project was inequitable given the parties' previous arrangements. Urban NY's most specific allegation relates to an Urban PA board resolution, which carries minimal weight. (*See id.* ¶ 47).

In fact, nowhere does Urban NY explain exactly what work each party performed, instead focusing on Urban NY's efforts in *pursuing* each project.

(*See* FAC ¶¶ 47-48).  And when Urban NY does mention its work on a project, it simply says that it performed "nearly all work on this project" (*id.* ¶ 47), far too conclusory an allegation to credit, *see Iqbal*, 556 U.S. at 681 (noting that the plausibility standard must be assessed after removing "conclusory" allegations).

To be sure, these allegations bear some of the hallmarks of an unjust enrichment claim, but, stripped of the conclusory language about unjustness (*see* FAC ¶¶ 47-48 (asserting that Urban PA "unduly retained profits" and "inequitably profited")), Urban NY does not provide enough facts to "nudge[ ] [its] claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570.  As such, Urban NY does not allege unjust enrichment with sufficient particularity.  *See Washington*, 2009 WL 855652, at *11; *Turchi*, 2011 WL 4086077, at *16.

### 10.    Urban NY Has Not Alleged a Viable Claim for *Prima Facie* Tort

Urban NY next brings a claim for a *prima facie* tort (FAC ¶¶ 137-142), alleging that Urban PA "maliciously and intentionally" harmed it "by, among other things, manufacturing and then leveraging its baseless claims for [the Report Balance], denying Plaintiff access to critical administrative resources, interfering with Plaintiff's ongoing and prospective customer relationships, hindering Plaintiff's ability to secure financing, and intentionally increasing the transaction costs related to … unwinding the businesses" (*id.* ¶ 138).

As an initial matter, Pennsylvania does not recognize a cause of action for a *prima facie* tort.  *See D'Errico* v. *DeFazio*, 763 A.2d 424, 433-34 (Pa.

Super. 2000) ("Pennsylvania has not yet adopted intention or *prima facie* tort …

because only our supreme court and the legislature can adopt new causes of

action in Pennsylvania."). The Court would thus have to do a choice-of-law

analysis if Urban NY had properly alleged a cause of action under New York

law. Alas, it has not.

To allege a *prima facie* tort under New York law, "the plaintiff must allege

'[i] the intentional infliction of harm, [ii] which results in special damages,

[iii] without any excuse or justification, [iv] by an act or series of acts which

would otherwise be lawful.'" *Kickertz* v. *N.Y. Univ.*, 971 N.Y.S.2d 271, 280 (1st

Dep't 2013) (quoting *Freihofer* v. *Hearst Corp.*, 65 N.Y.2d 135, 142-43 (1985)).

"There can be no recovery under this theory 'unless the malevolence is the sole

motive for the defendant's otherwise unlawful act.'" *Id.* (quoting *Burns Jackson

Miller Summit & Spitzer* v. *Lindner*, 59 N.Y.2d 314, 333 (1983)).

Urban NY's claims fail for two independent reasons. *First*, Urban NY

does not allege that Urban PA was solely motivated by malice. In fact, Urban

NY's own allegations show that Urban PA's main justification for its actions

was its "claims for millions of dollars," not malice. (FAC ¶ 138). *See

Cambridge Cap. LLC* v. *Ruby Has LLC*, 565 F. Supp. 3d 420, 477 (S.D.N.Y.

2021) (dismissing a claim because "motives of economic self-interest and

business advantage bar recovery in prima facie tort"). Indeed, throughout the

FAC, Urban NY acknowledges the economic dispute undergirding Urban PA's

actions. (*See* FAC ¶¶ 50-60 (describing the circumstances surrounding the

Report and the resulting actions by Urban PA)).

Urban NY argues that Urban PA's motivation is a question for trial.  (Pl. Opp. 25 (citing *Bank of N.Y.* v. *Berisford Int'l*, 594 N.Y.S.2d 152, 152-53 (1st Dep't 1993))).  But the case on which Urban NY relies involved a scenario in which the *defendant* offered alternative justifications for his conduct.  *Bank of N.Y.*, 594 N.Y.S.2d at 153.  Not so here, where Urban NY itself acknowledges Urban PA's alternative motivation directly in the FAC.  (*See* FAC ¶ 138 (attributing Urban PA's actions in part to the Report Balance)).

*Second*, the Court dismisses Urban NY's claim because it does not relate to conduct that "would otherwise be lawful" and for which "no traditional tort provides remedy," which is what the *prima facie* tort cause of action "was designed to provide."  *Kickertz*, 971 N.Y.S.2d at 280 (internal quotation marks omitted) (first quoting *Freihofer*, 65 N.Y.2d at 142-43; then quoting *Bassim* v. *Hassett*, 585 N.Y.S.2d 566, 568 (3d Dep't 1992)).  Here, the Court has already permitted Urban NY to raise a tort based on Urban PA's alleged interference with Urban NY's prospective economic advantage.  *See supra* B.6.  As such, Urban NY lacks a valid cause of action for *prima facie* tort.  *See Gallagher* v. *N.Y.C. Health & Hosps. Corp.*, No. 16 Civ. 4389 (GBD), 2017 WL 4326042, at *6 (S.D.N.Y. Sept. 20, 2017) (dismissing a claim when the plaintiff reasserted "the same allegations of misconduct and general harm that form the basis of their other causes of action" (collecting cases)), *aff'd*, 733 F. App'x 3 (2d Cir. 2018) (summary order).

C.     **The Court Grants Leave to Amend as to Certain Dismissed Counts**

The final question is whether the Court should grant Urban NY leave to amend the seven dismissed claims above, and whether it should grant leave to add a count for breach of the MOU. (*See* Pl. Opp. 26 (requesting leave to amend any dismissed causes of action); *id.* at 17 n.2 (requesting leave to add a claim for breach of the MOU in the event that the Court dismisses Urban NY's economic duress claim)). "[C]ourts should 'freely give leave [to amend] when justice so requires,'" but they "need not grant leave to amend if the amendments would be futile or cause undue delay." *In re ACTOS Direct Purchaser Antitrust Litig.*, 414 F. Supp. 3d 635, 649-50 (S.D.N.Y. 2019) (second alteration in original) (quoting Fed. R. Civ. P. 15(a)(2)), *aff'd sub nom.*, *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund* v. *Takeda Pharm. Co. Ltd.*, 11 F.4th 118 (2d Cir. 2021).

The Court here grants Urban NY leave to amend its claims for (i) breach of an implied-in-fact contract, (ii) conversion, and (iii) unjust enrichment because amendment may not be futile. Urban NY is cautioned to be mindful of this Opinion in deciding whether and how to replead these claims. The Court also grants Urban NY leave to add a claim for breach of the MOU.

The Court finds, however, that amendment would be futile regarding Urban NY's claims for (i) breach of the duty of good faith and fair dealing, (ii) economic duress, (iii) unfair competition, and (iv) *prima facie* tort. As such, the Court denies leave to amend those counts. *See Cuoco* v. *Moritsugu*, 222

51

F.3d 99, 112 (2d Cir. 2000) ("The problem with [these] causes of action is substantive; better pleading will not cure it.").

## CONCLUSION

For the reasons set forth above, Defendant's motion is GRANTED IN PART and DENIED IN PART. Specifically, it is granted with prejudice as to Counts III, IV, VII, and X; granted without prejudice as to Counts II, VIII, IX; and denied with respect to all other Counts.

Plaintiff shall file its second amended complaint on or before **May 1, 2026**. Defendant shall answer or otherwise respond to that complaint on or before **May 29, 2026**.

The Clerk of Court is directed to terminate the pending motion at docket entry 33.

SO ORDERED.

Dated:    March 27, 2026
        New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge